**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
**DAMIEN "DDOT" WASHINGTON,**

                         **Plaintiff,**

       **-against-**

**EVEN LABS INC. and ENRIQUE "MAG"**
**RODRIGUEZ,**

                    **Defendants.**
-------------------------------------------------------------------X

Index No. 1:26-cv-1294

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Damien "DDOT" Washington ("Washington") by and through his attorneys, Guilford Law Group, PLLC, hereby files this Complaint against EVEN Labs Inc. ("EVEN") and Enrique "Mag" Rodriguez ("Rodriguez") and alleges as follows:

## NATURE OF THIS ACTION

1.      Washington is a former employee of EVEN who was discriminated against on the basis of his race and gender, deliberately misclassified as an independent contractor and denied overtime, wage notices, wage statements, and benefits, and then retaliated against when he blew the whistle on unlawful conduct, including the unauthorized distribution of Babygrande Global, Inc.'s ("Babygrande") intellectual property.

2.      Despite written agreements confirming his full-time employment and equity stake, EVEN and Rodriguez persisted in an unlawful pattern and practice of misclassifying Washington to suppress labor costs and obligations. EVEN and Rodriguez retaliated against Washington by stripping him of responsibilities, withholding commissions, and refusing to indemnify or provide legal protection when Babygrande named him in a lawsuit as a result of his employment with

EVEN. As a further retaliatory act, EVEN wrongfully terminated Washington on September 4, 2025.

3.      Through this Complaint, Washington asserts claims for (1) discrimination; (2) retaliation; (3) hostile work environment; (4) unjust enrichment; (5) breach of contract; and (6) violations of New York Labor Law.

4.      Washington seeks monetary relief to remedy these violations of the Civil Rights Act, New York Labor Law, the New York City Administrative Code, New York State Human Rights Law, and other applicable laws.

## **PARTIES**

5.      Plaintiff  Damien "DDOT" Washington ("Washington") is a 37 year old African American male residing in Maryland. From approximately March 2023 to September 2025, Washington was employed by defendant EVEN Labs Inc. Washington's last title at EVEN was the Director of Business Development.

6.      Defendant EVEN Labs Inc. is a Delaware corporation with principal offices in Milwaukee, Wisconsin, that operates an online music platform and streaming service. EVEN conducts business in New York and, at all relevant times, was Washington's employer as defined by the New York Labor Law ("NYLL") and other applicable laws.

7.      Defendant Enrique "Mag" Rodriguez ("Rodriguez") is an individual residing in New York. Rodriguez is Founder and Chief Executive Officer ("CEO") of EVEN. At all relevant times, Rodriguez exercised control over Washington's employment (including hiring, firing, supervision, and setting pay) and is an "employer" under the NYLL.

8.      Rodriguez hired Washington to work closely with him in New York. Though working remotely, Washington consistently traveled to New York, took meetings with prospective

clients, and held meetings with Rodriguez and his colleagues at EVEN in New York. Rodriguez made New York State and City tax deductions from Washington's paychecks.

## JURISDICTION AND VENUE

9.      This Court has Jurisdiction over the subject matter of the instant Complaint pursuant to 28 U.S.C. S 1331 because the Plaintiff brings an action arising under the laws of the United States. The Court has Jurisdiction over Plaintiff's claims arising under State and local laws because they arise from the same set of facts forming the basis of Plaintiff's federal claims.

10.     Venue in this district is proper as to Defendants pursuant to 28 U.S.C. § 1391(b)(1), (2) and (3), and New York Civ. Prac. L. & R. §§ 301 and 302(a)(3)(i) and (ii), because Rodriguez resides in New York City, and all of the Defendants, upon information and belief, (a) do business from one or more New York City addresses, (b) regularly do and solicit business, and engage in a persistent course of conduct, and derive substantial revenue from goods used or consumed or services rendered, in the state of New York, (c) expect or should reasonably expect their services to have consequences in the state of New York, and (d) derive substantial revenue from interstate and international commerce.

## ADMINISTRATIVE REMEDIES

11.     Plaintiff exhausted all administrative remedies. Plaintiff timely filed a formal complaint with the EEOC on November 20, 2025. The EEOC has issued a right to sue letter dated November 26, 2025.

## FACTUAL ALLEGATIONS

12.     In or around March 2023, Rodriguez recruited Washington to join EVEN to lead business development and partnerships for the company. Washington was initially hired as a contractor, signing a contract with Even on April 27, 2023. Subsequently, around August 2023,

3

Washington began working as a full-time employee for EVEN as an Artist Relations Manager. His agreed upon salary at that time was $75,000 annually and he was entitled to an equity stake in EVEN. Washington worked in that capacity until March 2024 when he began to work for another company; however, during that period, Washington remained with EVEN as a contractor from April 2024 until September 2024.

13.     Consistently, between November 2023 and December 2023, Washington inquired with Rodriguez about officially appointing him to "Head of Artist Relations" at EVEN, which was originally promised to him verbally in several conversations with EVEN. Rodriguez began to backtrack on his promises and instead cited false instances and fabricated stories of why Washington was not "ready" for the position, despite being the leader in sales and artist relations client onboarding. These excuses were pretext and not the real reason Washington was denied said promotion. In reality, Rodriguez wanted someone of a different race and gender than Washington.

14.     On or about January 24 2024, Rodriguez filled the position of Head of Artist Relations, with a person of a different gender, younger age and different racial/ethnic background than Washington, who had far less years of industry experience than Washington. On May 14 2025, said employee admitted to Mr. Washington that they were not fit for the job and should not have been hired by Rodriguez for the position.

15.     Between approximately September 2023 and July 2024, Defendant Rodriguez repeatedly directed Plaintiff to pursue purported "artist relations" initiatives involving specific female recording artists, not for legitimate commercial purposes, but to facilitate Rodriguez's personal interests in cultivating physical proximity to women whom Defendant Rodriguez expressly described to Plaintiff in terms of personal physical attraction and interest.

16.     Rodriguez explicitly framed these directives in terms of personal attraction and social access rather than bona fide company strategy, thereby compelling Plaintiff, as a condition of continued employment and ongoing access to professional responsibilities and advancement under Defendant Rodriguez's supervisory authority, to function as an intermediary facilitating Rodriguez's personal sexual interests under the pretext of professional business development.

17.     Between September 2023 and November 2023, Defendant Rodriguez disclosed to Plaintiff, his employee, explicit and graphic details concerning a sexual encounter between Defendant and a woman, details unrelated to any business purpose.

18.     These disclosures were unsolicited, unwelcome, and inappropriate. This conduct contributed to a degrading and abusive work environment that interfered with Plaintiff's ability to perform his job duties and undermined his dignity and professional standing.

19.     On or about March 20, 2024, while Plaintiff was engaged by EVEN as a contractor, Defendant Rodriguez contacted Plaintiff by phone and requested that Plaintiff assist in physically confronting a perceived business competitor. Plaintiff understood this request to involve violence.

20.     Plaintiff refused. This request caused Plaintiff significant distress and fear and contributed to an unsafe and hostile working environment. Plaintiff objected to the request on moral and legal grounds. Following Plaintiff's objection, Plaintiff was further subjected to hostility and, ultimately, termination.

21.     In August 2024, Washington became aware of and involved in a business dispute between EVEN and Babygrande, a music company. Babygrande is the exclusive rights holder for the artist Stove God Cooks.

22.     Upon information and belief, Rodriguez and others at EVEN planned to release a Stove God Cooks's musical project via EVEN's platform to generate direct-to-fan revenue, despite not securing proper licenses or permissions from Babygrande.

23.     On or about August 26, 2024, EVEN, through Rodriguez and other team members, uploaded and launched the Stove God Cooks release on the EVEN platform.

24.     This release included streaming of musical recordings and the sale of related content to fans.

25.     Almost immediately, disputes arose as Babygrande asserted that the release was unauthorized and infringed Babygrande's copyrights and trademarks. This dispute is the subject of Babygrande's claims in another action.

26.     Washington was alarmed that EVEN's actions regarding the Stove God Cooks release were unlawful.

27.     Upon learning that Babygrande had not given clear authorization, Washington internally urged EVEN and Rodriguez to resolve the legal issues. Washington urged Rodriguez several times between August 27th and August 31st to resolve the issues with Babygrande. Rodriguez and EVEN instead continued to promote the Stove God Cooks release.

28.     In late August and September 2024, Washington voiced these concerns directly to Rodriguez and other senior team members.

29.     Washington urged that EVEN make efforts to resolve Babygrande's dispute over the Stove God Cooks project. For example, during several phone calls with Rodriguez between August 27 and August 31 2024, Washington emphatically urged Rodriguez to take all necessary steps to resolve the dispute with Babygrande; however, Rodriguez insisted that the project was lawful. Washington then inquired about the commission he was owed from the release to which

Rodriguez claimed that he would not pay Washington the commission due to the legal dispute with Babygrande. However, Rodriguez and EVEN did pay Stove God Cooks from the revenue generated and Rodriguez/EVEN pocketed 20%.

30.     Upon information and belief, Rodriguez and EVEN were fully aware by late August 2024 that proceeding with the Stove God Cooks release was infringing on Babygrande's rights.

31.     Upon information and belief, Babygrande sent a cease and desist letter or similar notice shortly after the launch, notifying EVEN of the copyright and trademark violations. Despite this, on August 29, 2024, Rodriguez continued executing additional methods to capitalize on the fan sales.

32.     Only after Washington and perhaps others pressed the issue did EVEN begrudgingly agree to pause further promotion of the Stove God Cooks release.

33.     Washington's repeated internal complaints about this illegal activity are protected whistleblower activity under New York law.

34.     Washington's objections were not well received by Rodriguez.

35.     Rodriguez was solely focused on EVEN's business interests and took offense at Washington's insistence on following the law.

36.     Rodriguez's reaction suggested that if Washington was not on board with the company's approach his position at EVEN was in jeopardy.

37.     Following Washington's complaints, the Defendants took actions that adversely affected Washington's employment.

38.     After Washington became weary of Rodriguez business practices, Mariam Camara, a Director at Even, specifically inquired about Washington's commission on the Stove God Cooks

fan revenue. However, upon Rodriguez's direction, EVEN still did not pay Washington any commission for the Stove God Cooks project.

39.    In October of 2024, Washington was rehired by EVEN with the title of Director of Business Development, responsible for spearheading partnership initiatives, expanding EVEN's network within the music industry, and driving strategic growth.

40.    Washington's role was integral to EVEN's mission, and he worked full-time in this position.

41.    In October 2024, when Washington was rehired, Defendants agreed to compensate Washington with an annual salary and a new equity stake in the company.

42.    The agreed upon salary was approximately $90,000 per year, nonexempt base, and Washington was to receive additional equity ownership in EVEN.

43.    This equity was documented to vest over 24 months, commencing in 2023, reflecting the commencement of Washington's employment at that time. An additional equity grant vesting over 24 months was later promised to Washington in 2024.

44.    Despite Washington's full-time role and integration into EVEN's leadership team, Defendants misclassified him as an independent contractor rather than an employee during that time.

45.    Rather than putting Washington on the regular payroll, EVEN paid his salary through a third-party service called "Deel," with semi-monthly wire transfers. Deel was not the service that EVEN used for it's full time US based employees.

46.    Specifically, Defendants arranged for Washington's $90,000.00 nonexempt base salary to be paid biweekly via Deel.

47.     Upon information and belief, Defendants EVEN and Rodriguez maintained internal payroll and onboarding practices pursuant to which U.S. based full-time employees were paid through Paylocity, while non-U.S. or non-employee workers were paid through the Deel platform.

48.     Plaintiff was a U.S. based, full-time employee who reported directly to EVEN's Chief Executive Officer, performed core business functions, and worked the same schedule and duties as other salaried U.S. employees, yet was singularly routed through Deel rather than EVEN's regular U.S. payroll system.

49.     This deviation from EVEN's standard payroll practices was not inadvertent. Plaintiff repeatedly questioned the legality of being paid as a "contractor" while working full time, and Defendants acknowledged the legal risk of this arrangement.

50.     Defendants' selective use of Deel for Plaintiff, while using Paylocity for other U.S. employees evidences that Plaintiff's misclassification was knowing, intentional, and designed to evade payroll taxes, wage protections, and employment benefits.

51.     Plaintiff did not receive wage notices, pay stubs, or employment documentation consistent with New York labor law.

52.     Washington was not provided the normal wage notices or pay stubs that New York employees receive. Washington was unaware of the amount of taxes or deductions made on his checks.

53.     Washington grew concerned that being paid "as a contractor" despite working full-time was unlawful.

54.     On or about October 2, 2024, in a text message exchange with Washington, Rodriguez explicitly asked: "You cool with this pay as contractor thing or no" Washington responded, "This part of 'being a team player'?" Rodriguez responded, "Because it's not necessarily legal." Upon information and belief, shortly thereafter, Rodriguez used the Apple iPhone "unsend" or message-retraction feature in an apparent attempt to delete or conceal his acknowledgment of the illegality of Washington's misclassification. However, Washington's laptop simultaneously captured the unredacted message, preserving the communication. A true copy of a screenshot of this text message exchange is embedded below.



55.     Rodriguez's response was dismissive, replying with "Lmao" (laughing) and pushing Washington to accept the arrangement regardless. Even though Rodriguez acknowledged that Washington was a full-time, integral team member, even describing the position as "*Full time Director of Business Development*," he insisted on keeping Washington classified as a contractor.

56.    In that same conversation, Rodriguez agreed to match an outside salary offer Washington had (raising the pay from $7,200 to $7,500 per month) but conditioned that Washington would be paid via contractor methods.

57.    Washington, under financial pressure to accept the job and relying on Rodriguez's assurances, reluctantly agreed to proceed, despite his stated concerns about the legality.

58.    From 2023 onward, Washington performed the same duties and worked the same schedule as a regular full-time employee of EVEN.

59.    Washington reported directly to Rodriguez and interacted with other top executives at EVEN on a daily basis.

60.    Washington was responsible for onboarding new business partners, negotiating deals, managing artist relations alongside the Head of Artist Relations, and representing EVEN at industry events.

61.    During his tenure with EVEN, Washington generated substantial revenue and enterprise value for the company. By September 2025, Washington had directly generated in excess of $400,000 in gross merchandise value ("GMV") through partnerships he sourced, negotiated, and managed on EVEN's behalf. In addition, Washington was actively developing and had substantially advanced strategic partnerships, all of which remained pending at the time of his wrongful termination.

62.    Washington typically worked in excess of 40 hours per week, including frequent evening and weekend work, given the startup nature of the business and the need to be available across multiple time zones. Rodriguez would often message Washington at all hours (early mornings, late nights) about business matters, and Washington was expected to respond and act promptly.

63.    Washington's workload and duties were such that he regularly worked overtime (70+ hours per week), yet, due to Rodriguez's intentional misclassification, EVEN never paid him any overtime premium pay for hours worked over 40 per week.

64.    Because Defendants intentionally misclassified Washington, they failed to provide him with the required New York Wage Theft Prevention Act notices and wage statements.

65.    Washington did not receive a written notice at the time of hire detailing his rate of pay, overtime rate, pay frequency, and other information as mandated by NYLL § 195(1).

66.    Defendants also did not provide Washington with regular wage statements (pay stubs) listing hours worked, rates paid, gross and net wages, deductions, and other relevant information, as mandated by NYLL § 195(3).

67.    Furthermore, Washington was not enrolled in any employee benefits programs (such as health insurance, unemployment insurance, or workers' compensation) that a full-time employee would normally receive. The misclassification was a deliberate attempt by Defendants to evade labor laws and employee protections.

68.    Between approximately March 2025 and April 2025, Plaintiff raised good-faith concerns regarding his misclassification, lack of payroll documentation, and unlawful pay practices to EVEN's Director of People & Culture, Andrea Torres, among others.

69.    Plaintiff specifically objected to being paid as a contractor through Deel despite performing full-time employee duties, receiving a fixed salary, and reporting directly to the CEO, and Washington expressed concern that the arrangement violated labor and wage laws.

70.    These complaints constituted protected activity under New York Labor Law §§ 215 and 740, as Plaintiff was objecting to and reporting conduct he reasonably believed to be unlawful.

71.     Defendants were on actual notice of Plaintiff's complaints and concerns well before his termination

72.     In or about January 2025, Defendant Rodriguez directed Plaintiff, in his role as Director of Business Development, to complete a partnership initiative with a third-party platform. Plaintiff expressed reservations about the partnership, but Defendant Rodriguez insisted that Plaintiff proceed. Plaintiff complied and successfully completed the partnership.

73.     Defendant Rodriguez agreed that Plaintiff would receive a bonus of $2,500 for completing this initiative. Despite Plaintiff's successful performance, Defendants failed to pay the agreed bonus.

74.     On or about March 17, 2025, Plaintiff raised good-faith concerns to Defendant Rodriguez regarding irregularities in user data originating from the third-party partnership, including the appearance of profiles that were not verified as belonging to the named artists or creators. Plaintiff expressed concern that these profiles could create misleading impressions if publicly represented as authenticated users.

75.     Defendant Rodriguez declined to effectively address Plaintiff's concerns. Instead, Defendants Rodriguez and EVEN, publicly promoted user growth metrics that included the unverified profiles Plaintiff had flagged.

76.     Following Plaintiff's internal objections, Defendants' treatment of Plaintiff materially changed. Plaintiff was excluded from work-related travel, stripped of professional credit in public communications, and experienced delays in compensation.

77.     Defendants' actions were retaliatory and taken in response to Plaintiff's protected activity in raising ethical and compliance related concerns.

78.     Decisions about partnerships and product launches that normally would involve Washington went forward without his input due to retaliation by Rodriguez. Rodriguez also delayed or withheld payments that were due to Washington in retaliation.

79.     On or about March 25, 2025, Defendant Rodriguez directed Plaintiff, in his role as Director of Business Development, to coordinate a business event in the United Kingdom with a third-party technology company that maintained a business and investment relationship with EVEN.

80.     Plaintiff was assigned responsibility for securing a professional recording artist to participate in a panel discussion alongside Defendant Rodriguez. Plaintiff negotiated a budget with the third party that was intended to cover the artist's appearance fee and related expenses. Plaintiff secured an artist who agreed to participate for the agreed-upon fee.

81.     During the planning process for the panel discussion, Defendant Rodriguez communicated to Plaintiff that he expected a portion of the funds allocated for the artist to be redirected away from the artist.

82.     Plaintiff understood this expectation to be inconsistent with the agreed purpose of the funds and refused to participate in any redirection or improper handling of third-party funds.

83.     To ensure compliance with the agreed arrangement, Plaintiff facilitated direct communication between the third-party company and the artist so that payment would be made directly to the artist.

84.     Finally, on or about May 21, 2025, Defendant Rodriguez confronted Plaintiff regarding why payment had been made directly to the artist.

85.    Following Plaintiff's refusal to participate in redirecting the artist's funds back to EVEN, Defendant Rodriguez became even more hostile toward Plaintiff. Plaintiff was removed from participation in the event and excluded from related travel and business opportunities.

86.    These actions were taken in retaliation for Plaintiff's refusal to engage in conduct he reasonably believed to be unethical and improper and possibly unlawful, and for Plaintiff's protected whistleblowing activity.

87.    On or about Apr 22, 2025, Rodriguez further retaliated against Washington by removing accreditation for Washington's work in a press release for a partnership with United Masters.

88.     This was a violation and breach of their April 9, 2024 agreement that stipulated "Consultant shall be mentioned and notated in all press releases by name [Damien "DDOT" Washington] regarding releases and partnerships to which Consultant was responsible for facilitating and contributing to delivering to EVEN". Rodriguez told Washington that because he was named as a co-defendant in the ongoing Babygrande Global lawsuit that he was not fit to be publicly associated with EVEN in press material to the media. However, in the press statement Rodriguez credited himself for Washington's work.

89.    In the weeks that followed, Washington noticed he was being excluded from key meetings and communications to which he previously had access. He was also removed from EVEN's administrative systems which he previously had access to.

90.    Between May 9, 2025 and May 12, 2025, Washington was again discriminated and retaliated against by Enrique Mag Rodriguez who declined to accommodate travel for a work trip that was based around a company event tied to a partnership that Washington was responsible for. Rodriguez told Washington that it would be too expensive for him to come on the trip but then

opted to take employees of a different gender and race/ethnic background on the trip, despite them having no involvement in the partnership or event itself and being junior to Washington in the company org chart. This was also a direct breach of Washington's agreement with EVEN stipulated "EVEN will cover travel costs to attend all related engagements (events, activations, parties, meetings, dinners and the like) in connection with partnerships, artists, releases, labels, and distributors facilitated by Consultant."

91.    Between June 2025 and July 2025, continuing a pattern of retaliatory and hostile work environment behavior, Defendant Rodriguez again prevented and deliberately removed Washington from receiving credits in press releases to major media outlets announcing partnerships that were results of Washington's work and industry relationships, hindering his abilities to advance his career and receive other lucrative opportunities.

92.    Between July 2025 and August 2025, Defendants Mag Rodriguez and EVEN deliberately distributed materials to investors and industry executives to receive financial investment into EVEN using Mr. Washington's work product to drive up the value of EVEN while crediting another employee of a different ethnic/racial background/gender for Mr. Washington's work as Director of Business Development while Mr. Washington was still actively employed at EVEN. This employee had not contributed to the extensive and substantial transformative work that Mr. Washington provided the deals and partnerships that he procured.

93.    Plaintiff became aware of internal materials created by Defendants Rodriguez and EVEN that attributed Plaintiff's business development work and partnerships to another employee, despite Plaintiff being actively engaged by EVEN at the time and holding the title of Director of Business Development.

94.     In addition to observing that his work was attributed to another employee, Plaintiff became aware of materials created by Defendant Rodriguez and disseminated to external third parties, including potential business partners, which referenced partnerships and business relationships that, based on Plaintiff's personal knowledge and direct involvement, did not accurately reflect EVEN's actual commercial relationships.

95.     Concerned about how the externally disseminated materials could reflect on him and his affiliation with EVEN, Plaintiff sought clarification internally regarding the referenced partnerships. Plaintiff was unable to confirm that the asserted commercial relationships existed, reinforcing his concern that the materials did not accurately reflect EVEN's actual business relationships.

96.     In the weeks leading up to Plaintiff's termination, beginning on or about August 7, 2025, Defendant Rodriguez, who Plaintiff directly reported to, ceased all direct substantive communication with Plaintiff. Rodriguez no longer engaged with Plaintiff regarding assigned tasks, strategy, performance expectations, or business priorities, despite Plaintiff's role as Director of Business Development requiring executive coordination and guidance.

97.     During this same period, Rodriguez also began removing Plaintiff from communications with external stakeholders, including prospective clients and partners that Plaintiff himself had sourced, introduced, and brought into active negotiations on EVEN's behalf. In place of Plaintiff, Rodriguez inserted other EVEN employees, including employees of a different gender and/or color or ethnicity than Plaintiff, who had not previously been involved in these relationships or negotiations.

98.     This conduct directly interfered with Plaintiff's ability to perform his role and materially impacted his compensation, as Plaintiff's agreed-upon bonus and commission

incentives were expressly tied to his successful negotiation, onboarding, and management of such clients. By excluding Plaintiff from these communications and transferring control of the relationships to others, Defendants constructively impeded Plaintiff's ability to earn compensation he had been promised, further evidencing retaliatory intent.

99.    Concurrently, Plaintiff experienced increased hostility, harassment, and interference with his work. Defendants and other EVEN employees; including a newly hired Chief Operating Officer Lauren Wirtzer, engaged in adversarial conduct, interfered with Plaintiff's assigned accounts and client relationships, attempted to usurp Plaintiff's industry contacts, demanded access to Plaintiff's intellectual property and work product without justification, and undermined Plaintiff's authority in dealings with partners and clients.

100.    These actions were inconsistent with Plaintiff's prior performance evaluations and responsibilities and occurred only after Plaintiff engaged in protected activity.

101.    Defendants' conduct materially impaired Plaintiff's ability to perform his duties and constituted retaliation and interference in the weeks immediately preceding his termination.

102.    Ultimately, on Sep 4, 2025, EVEN wrongfully terminated Washington without cause.

103.    Shortly thereafter, on or about September 19, 2025, Defendants posted a job listing advertising Plaintiff's former position under an upgraded title, "Head of Business Development," but with increased compensation.

104.    Upon information and belief, soon thereafter, Defendants Rodriguez and EVEN Defendants hired a replacement, an individual of a different gender and color/ethnicity/race than Plaintiff, in the role of Head of Business Development.

18

105.    On or about September 24, 2025, Defendants publicly announced a partnership that Plaintiff had solely procured in September 2024, again omitting Plaintiff's name and denying Plaintiff agreed-upon compensation for the work.

106.    Defendant Rodriguez, on several instances, demonstrated preferential treatment to employees of a different gender and color/ethnicity/race than Washington.  Black males hired at EVEN during Washington's employment, were subsequently terminated or demoted by Rodriguez while other underperforming employees that were not black males were not terminated at the same rate, showing a pattern of discrimination and disparate treatment by Rodriguez and EVEN.

107.    Upon information and belief, on or around October 6, 2025, Defendants Rodriguez and EVEN filed a report with "LinkedIn" (a professional networking platform), falsely accusing Washington of providing inaccurate information regarding his employment history. Specifically, Rodriguez and EVEN falsely asserted that Washington had never been an employee of EVEN, despite extensive documentary evidence to the contrary. As a direct result of this false report, Washington's LinkedIn profile was restricted, preventing recruiters and professional contacts from reaching him, causing reputational harm and constituting tortious interference with Washington's prospective economic relationships.

108.    These acts were undertaken in retaliation for Washington's protected whistleblowing activity and refusal to participate in unlawful conduct, and further demonstrate a pattern of post-termination retaliation, discrimination, and bad-faith efforts to suppress Washington's career prospects.

109.    As a result of Defendants' unlawful actions, Washington has suffered damages, including, but not limited to, lost wages and benefits; unpaid overtime wages for the overtime hours he worked while misclassified; statutory penalties for missing wage notices and wage

statements; damage to his career and reputation; and emotional distress from the harassment and abrupt loss of his job.

110.    As a direct and proximate result of Defendants' misconduct and wrongful termination, Washington also lost ongoing and reasonably certain economic opportunities generated by his business development efforts.

111.    All conditions precedent to the filing of this complaint have been satisfied, have occurred, or have been waived.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Retaliation as Against All Defendants**

**(42 U.S.C. 1981)**

112.    Plaintiff incorporates and re-alleges by reference the allegations contained in paragraphs 1 through 111 as if fully set forth herein.

113.    Under Federal Law, it is unlawful for an employer to retaliate or discriminate in any manner on the basis of an employee's complaints about unlawful business practices or discrimination. A prima facie case of retaliation is demonstrated when a party participated in a protected activity, the defendant knew about her participation, the defendant took an employment action that disadvantaged the plaintiff and there is a causal connection between the protected activity and the negative employment action.

114.    In this case, the Plaintiff complained to the Defendants about Defendants' unlawful business practices, discrimination and failure to promote Plaintiff.

115.    The Defendants were aware of Plaintiff's complaints but failed to take any steps to address the complaints. Defendant took adverse employment actions against Plaintiff and ultimately wrongfully terminated Plaintiff in retaliation for Plaintiff's complaints.

116.    Defendant's actions constitute unlawful retaliation for which the Plaintiff has suffered damages.

117.    As such, Plaintiff seeks damages on the First Cause of Action including, inter alia, back pay, front pay, compensatory damages, punitive damages, attorney's fees in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Retaliation

### (New York Labor Law § 740)

118.    Plaintiff incorporates and re-alleges by reference the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

119.    NY Labor Law § 740 ("NYLL § 740") prohibits an employer from taking any retaliatory action against an employee (which includes current and former employees and independent contractors) because the employee, "in good faith, reasonably believes" that the employer's activity or practice is in violation of law, and discloses or threatens to disclose such activity to a supervisor or public body, or objects to or refuses to participate in the activity.

120.    Washington engaged in protected whistleblowing activity under NYLL § 740. Specifically, as alleged above, Washington objected to, refused to participate in and complained about Defendants' illegal business activities.

121.    Defendants were fully aware of Washington's complaints and objections.

122.    Defendants and Rodriguez directly received text messages and verbal statements from Washington concerning his complaints. Thus, EVEN (through its officers) had notice of Washington's protected whistleblowing.

123.    Defendants retaliated against Washington because of his whistleblowing activity.

124.    As such, Plaintiff seeks damages on the First Cause of Action including, *inter alia*, back pay, front pay, compensatory damages, punitive damages, attorney's fees in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### Retaliation As Against All Defendants

### (New York State Human Rights Law and New York City Human Rights Law)

125.    Plaintiff incorporates and re-alleges by reference the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

126.    Under New York State Human Rights Law and New York City Human Rights law, it is unlawful for an employer to retaliate or discriminate in any manner on the basis of an employee's complaints about unlawful business practices or discrimination. A prima facie case of retaliation is demonstrated when a party participated in a protected activity, the defendant knew about her participation, the defendant took an employment action that disadvantaged the plaintiff and there is a causal connection between the protected activity and the negative employment action.

127.    In this case, the Plaintiff complained to the Defendants about Defendants' unlawful business practices, discrimination and failure to promote Plaintiff.

128.    The Defendants were aware of Plaintiff's complaints but failed to take any steps to address the complaints. Defendant took adverse employment actions against Plaintiff and ultimately wrongfully terminated Plaintiff in retaliation for Plaintiff's complaints.

129.    Defendant's actions constitute unlawful retaliation for which the Plaintiff has suffered damages.

130.    As such, Plaintiff seeks damages on the Second Cause of Action including, *inter alia*, back pay, front pay, compensatory damages, punitive damages, attorney's fees in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Failure to pay wages As Against All Defendants

### (New York Labor Law § 191)

131.    Plaintiff incorporates and re-alleges by reference the allegations contained in paragraphs 1 through 130 as if fully set forth herein.

132.    Defendant EVEN initially set semi-monthly pay dates (1st and 15th), which is compliant in form. However, EVEN failed to actually pay Washington all that he was owed on those dates. Washington was damaged thereby.

133.    As a result of these violations, Washington is entitled to relief under New York Labor Law.

134.    As such, Washington is entitled to an award of all unpaid and late-paid wages, liquidated damages, interest, and attorneys' fees and costs under NYLL, as outlined in the Prayer for Relief.

## FIFTH CAUSE OF ACTION

### Failure to Pay Overtime Wages as Against All Defendants

**(New York Labor Law §652 et. seq.)**

135.    Plaintiff incorporates and re-alleges by reference the allegations contained in paragraphs 1 through 134 as if fully set forth herein

136.    The overtime wage provisions of the New York Labor Law and its supporting regulations apply to Defendants and protect the Plaintiff.

137.    Defendants failed to pay Plaintiff overtime wages to which Plaintiff is entitled under the New York Labor Law and the supporting New York State Labor Regulations.

138.    By Defendant knowing or intentional failure to pay Plaintiff overtime minimum wages for hours worked, they have willfully violated the New York Labor Law, and the supporting New York State Department of Labor Regulations.

139.    Due to Defendant violations of the New York Labor Law, Plaintiff is entitled to recover unpaid overtime wages, liquidated damages, reasonable attorney's fees and costs of the action, and pre-judgment and post-judgment interest from the Defendant.

## SIXTH CAUSE OF ACTION

**Failure to Provide Wage Notices as Against All Defendants**

**(NY Lab. Law §198(1-b) & NY Lab. Law §198(1-d))**

140.    Plaintiff incorporates and re-alleges by reference the allegations contained in paragraphs 1 through 139 as if fully set forth herein

141.    Pursuant to the Wage Theft Prevention Act, New York Labor Law, §195, Defendant willfully failed to furnish Plaintiff with an accurate statement of wages as required by NYLL §195(3), containing the dates of work covered by that payment of wages; name of the employee; name of the employer; address and phone number of employer; rate or rates of pay and basis thereof; whether paid by hour, shift, day, week, salary, piece, commission, or other; gross

wages; hour rate or rates of pay, and overtime rates of pay; the number of hours worked, including over time hours; deductions, allowances, and net wages.

142.    Due to Defendants' violation of NYLL §195, Plaintiff is entitled to recover from Defendant, liquidated damages, reasonable attorney fees, and costs and disbursements of this action, pursuant to NYLL § 198(1-b).

143.    Defendants failed to provide Plaintiff an accurate statement with each payment of wages that sets forth Plaintiff's hours worked, rates of pay, gross wages, credits claimed (for tips, meals and lodging) if any, deductions and net wages.

144.    Due to Defendant violation of NYLL §195(3), Plaintiff is entitled to recover from Defendant liquidated damages of $250 per each workday that the violation occurred, up to a maximum of $5,000, reasonable attorney fees, and costs and disbursements of this action, pursuant to NYLL § 198(1-d).

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment as Against All Defendants

145.    Plaintiff incorporates and re-alleges by reference the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

146.    Defendants knowingly accepted and retained the benefits of Washington's revenue-generating work, including hundreds of thousands of dollars in GMV and multimillion-dollar partnership opportunities, while refusing to pay agreed compensation, commissions, or equity. Retention of these benefits without compensation is inequitable and unjust.

147.    During his employment with EVEN, Washington incurred significant out-of-pocket business expenses on behalf of the Defendants, including, but not limited to, travel, meals,

marketing, and operational costs necessary to perform his role as Director of Business Development.

148.    Defendants expressly promised reimbursement of these business expenses. For example, in or around October 2023, Washington submitted a $500 reimbursement request for company-related expenses that was never paid due to a failed payment process, despite Rodriguez's assurance that reimbursement would be approved.

149.    Washington repeatedly followed up on this and other reimbursements, yet Defendants failed and refused to complete payment, thereby unjustly retaining the benefit of Washington's expenditures without compensation.

150.    By failing to reimburse Washington for legitimate business expenses, Defendants were unjustly enriched at Washington's expense. Defendants received the benefit of Washington's payments for company purposes while shifting the costs entirely onto him.

151.    Equity and good conscience require that Defendants disgorge the amounts wrongfully withheld and reimburse Washington for all unpaid business expenses, with interest.


## EIGHTH CAUSE OF ACTION

### Discrimination as Against All Defendants

### (New York State Human Rights Law and New York City Human Rights Law)

152.     Plaintiff incorporates and re-alleges by reference the allegations contained in paragraphs 1 through 151 as if fully set forth herein .

153.    Defendants intentionally discriminated against the Plaintiff in violation of the New York State Human Rights Law and New York City Human Rights Law.

154.    Defendant discriminated against the Plaintiff because of his race and/or gender.

155.    As a result of the Defendants' unlawful discrimination, Plaintiff has lost pay and benefits and suffered substantial emotional distress, pain, and suffering.

## NINTH CAUSE OF ACTION

### Discrimination as Against All Defendants

### (Title VII of the Civil Rights Act of 1964 as Amended by the Civil Rights Act of 1991 and 42 U.S.C. § 1981)

156.    Plaintiff incorporates and re-alleges by reference the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

157.    Defendants treated Plaintiff less favorably than similarly situated employees of different race and gender in the terms and conditions of Plaintiffs employment. Defendants' treatment of Plaintiff negatively and adversely impacted his employment.

158.    As a direct and proximate result of Defendants' discriminatory conduct Plaintiff suffered and will continue to suffer irreparable harm, pecuniary losses and other damages.

159.    Plaintiff is entitled to declaratory relief, injunctive relief, and compensatory and punitive damages to make him whole.

## TENTH CAUSE OF ACTION

### Hostile Work Environment as Against All Defendants

160.    Plaintiff incorporates and re-alleges by reference the allegations contained in paragraphs 1 through 159 as if fully set forth herein

161.    Defendants subjected Plaintiff to a hostile work environment based on his race and gender.

162.    The conditions and conduct that Plaintiff was subjected to were objectively and subjectively hostile and substantially and adversely impacted the terms and conditions of Plaintiff's employment

163.    Plaintiff complained about the hostile environment to management and Defendants/management failed to promptly prevent and correct the hostile, racially and gender discriminatory conduct.

164.    As a direct and-proximate result of Defendants' discriminatory conduct Plaintiff suffered and will continue to suffer irreparable harm, pecuniary losses and other damages. Plaintiff is entitled to declaratory relief, injunctive relief, and compensatory and punitive damages to make him whole.

## ELEVENTH CAUSE OF ACTION

### Breach of Contract as Against All Defendants

165.    Plaintiff incorporates and re-alleges by reference the allegations contained in paragraphs 1 through 164 as if fully set forth herein

166.    Plaintiff entered into a binding agreement with Defendants on or about April 9, 2024, whereby Defendant agreed, inter alia, to credit Plaintiff's work in all press releases for releases and partnerships that Plaintiff was responsible for facilitating or contributed to delivering to EVEN, to pay Plaintiff's travel costs and expenses for all related engagements in connection with partnerships, artists, labels, and distributors introduced to EVEN by Consultant, and to pay Plaintiff commissions.

167.    This agreement was supported by valuable consideration.

168.    Defendants intentionally breached this agreement by failing to perform as agreed.

169.    As a result of the breach, Plaintiff has damages, which include but are not limited to lost pay, lost commissions, loss of opportunities, consequential and compensatory damages.

170.    Accordingly, Defendants are liable for breach of contract.

## JURY DEMAND

171.    Plaintiff hereby demands a trial by jury on all causes of action.

**WHEREFORE**, the Plaintiff demands Judgment as follows:

a.    Declaring the actions, patterns, practices of the Defendants, their agents, servants and all those acting in concert with them constituted and does constitute violations of federal and state law.

b.    Awarding damages for economic and emotional injuries as well as interest, costs, disbursements, common law, statutory, compensatory, exemplary, and punitive damages, pre-judgment interest, pecuniary and non-pecuniary damages and such other and further relief as this Court deems just and proper.

c.    Awarding counsel fees, costs and disbursements of this action.

Together with such other and further equitable relief as this Court deems just and proper.

Dated: February 16, 2026
    New York, New York


                    Respectfully submitted,


                     /s/ William F. Guilford, Jr.
                    William F. Guilford, Jr, Esq.
                    Guilford Law Group, PLLC
                    Attorneys for Plaintiff
                    Damien "DDOT" Washington
                    333 Park Avenue South
                    Suite 3A
                    New York, New York 10010
                    Tel: (212)-653-0635
                    Email: wguilford@guilfordlawgroup.com